McDANIEL v. TULLIS, CRAIG & CO.
(No. 8054.)

Court of Civil Appeals of Texas. San Antonio.
Oct. 31, 1928.

Rehearing Denied Nov. 28, 1928.

204

Henry, Bickett & Bickett, of San Antonio, and D. Y. McDaniel, of Waco, for appellant.

Templeton, Brooks, Napier & Brown, of San Antonio, for appellee.

FLY, C. J. This is a suit on two promissory notes, one for $7,250, and the other for $3,500, both payable on demand, executed by Wilford McDaniel and Elmer G. Gunn, instituted by appellees against appellant, Elmer G. Gunn, and Blanche Young. Blanche Young was made a party on the ground that appellant had fraudulently conveyed to her certain property which appellees had levied upon under and by virtue of a writ of attachment obtained by them. Appellant sought to avoid liability on the two promissory notes on the grounds that appellant and Gunn for some time prior to January, 1925, were engaged in the business of brokers in several places in Texas; that they bought and sold for their customers cotton, with the under- standing among the parties that no cotton was to be actually received or delivered; that they did their business through the firm of E. B. Norman & Co., in New Orleans; that appellant and Gunn became indebted in a large sum of money to said New Orleans firm "as the result and on account of said speculating, illegal transactions with and through said Norman & Company"; that appellees being desirous of obtaining the business of McDaniel & Gunn agreed to pay off and discharge the debt to Norman & Co., in consideration of appellant doing business with and through Tullis, Craig & Co., and the execution of the note for $7,250. It was further alleged that the $3,500 note was given for advances made by appellees to appellant's firm "for the opening and operating expenses and the losses of said business," which appellees knew to be unlawful. After hearing the testimony the court instructed the jury to return a verdict for appellees against Wilford McDaniel and Elmer G Gunn for the sum of $10,750, and for the foreclosure of an attachment lien obtained by appellees on 862½ acres of land in Milam county. The deed to Blanche Young was declared void as against appellees.

These are the propositions of law upon which the appeal is predicated:

"1. Transactions, which, according to the form of the contract, are purchases or sales of cotton for future delivery, but which are really made upon a margin basis and with the intention of the parties that they are not actually to receive or deliver any cotton and that they shall settle upon the difference between the contract price and the market price at the time of closing out and that they shall merely speculate upon the rise or fall of the market prices, are wagers or gambling transactions and are illegal and void.

"2. A loan made by one party to another in order to enable the former to engage with the latter in a business, certain profits of which were to be divided between them, and the nature of which is conducting gambling transactions, is unenforceable by reason of the illegal consideration and subject matter.

"3. A loan made by one party to another to cover the operating expenses of a business, certain profits of which were to be divided between them, and which consisted of conducting gambling transactions, is unenforceable by reason of the illegal consideration and subject matter.

"4. The conduct of a local cotton 'exchange' in Texas, where 'contracts of purchase or sale of cotton for future delivery' were made and handled and transmitted to the New Orleans Cotton Exchange to be executed on the floor of the latter, is unlawful where it is not contemplated by the parties to the transactions that there shall be an actual delivery of cotton 'bought' or 'sold.'

"5. The law of Texas governs the validity of transactions in cotton futures where it is the intention of the parties to settle upon the difference between the contract price and the mar-

ket price of cotton at the time of closing out and to speculate upon the rise or fall of the market prices and not actually to deliver or receive any cotton."

■ There was testimony to sustain the allegations that the customers of appellant who were dealing in cotton futures did not expect or desire to deliver cotton sold in the one instance, nor to receive the cotton purchased, in the other. The customer, for instance, would give an order for the purchase of 100 bales of cotton in November at 15, 18, or 20 cents a pound. When November came no cotton was delivered to the customer, none was expected or desired. But if cotton had advanced, the amount of the advance would be paid by the broker to the customer, and if cotton had decreased in value the amount of the loss would be deducted from the sum required of each customer as a margin. If the customer sold and cotton went down the customer made money, but if it advanced he lost money. Twenty-five dollars was deducted from the margin as the broker's commission, one half being sent to appellees in New Orleans and the other half appropriated by appellant's firm. The proof showed that no actual cotton was handled and none expected. It may be taken as true, as stated in the first proposition, that the transactions therein narrated would constitute "wagers or gambling transactions and that they were illegal and void." The facts are undisputed and the law fixed and certain. Not a bale of cotton was ever delivered in any of the transactions, the reason for such nondelivery being accounted for by Craig by a failure on the part of anyone to demand delivery. It is significant that out of the vast number of customers, or "traders" as they were diplomatically called, not one of them ever wanted or asked for the cotton he had bought. The reason is apparent, no one had imagined for a moment that the cotton being dealt with had any existence so far as the parties were concerned. It was evidently not a sale of cotton, but a wager that cotton would rise or fall in price. Of course, there was no express agreement, orally or in writing, that no cotton was to be delivered, no more than there is an agreement that the game is one of chance when money is put into a roulette wheel. It did not require a positive agreement that no cotton should be handled—no one was so simple or uninformed as to require such an agreement. Doubtless if the cotton had been demanded by a customer it would have been delivered, as a matter of self-defense, but the brokers were comfortable in the assurance that no such demand would ever be made. It was never dreamed by any one that actual delivery was ever contemplated, and no one, broker or trader, ever so understood it. It is held in the case of Clews v. Jamieson, 182 U. S. 461, 21 S. Ct. 845, 45 L. Ed. 1183:

"In order to invalidate a contract as a wagering one, both parties must intend that instead of the delivery of the article there shall be a mere payment of the difference between the contract and the market price."

All the facts in this case tend to show that such intention existed with all the parties to the transactions.

■ As said by the Supreme Court of the United States in the case of Irwin v. Williar, 110 U. S. 508, 4 S. Ct. 165, 28 L. Ed. 225, and adopted by the Supreme Court in Seeligson v. Lewis, 65 Tex. 215, 57 Am. Rep. 593:

"The generally accepted doctrine in this country is, as stated by Mr. Benjamin, that a contract for the sale of goods to be delivered at a future day is valid, even though the seller has not the goods, nor any other means of getting them than to go into the market and buy them; but such a contract is only valid when the parties really intend and agree that the goods are to be delivered by the seller and the price to be paid by the buyer; and, if under guise of such a contract, the real intent be merely to speculate in the rise or fall of prices, and the goods are not to be delivered, but one party is to pay to the other the difference between the contract price and the market price of the goods at the date fixed for executing the contract, then the whole transaction constitutes nothing more than a wager."

The facts bring this case clearly within the transactions described in the cited cases, which will invalidate any contract made under the terms described. The cases are all in full accord on the subject. Embrey v. Jemison, 131 U. S. 336, 9 S. Ct. 776, 33 L. Ed. 172; Floyd v. Patterson, 72 Tex. 202, 10 S. W. 526, 13 Am. St. Rep. 787; Oliphant v. Markham, 79 Tex. 543, 15 S. W. 569, 23 Am. St. Rep. 363; Logan v. Norris, 100 Tex. 228, 97 S. W. 820; Lovejoy v. Kaufman, 16 Tex. Civ. App. 377, 41 S. W. 507; Kenedy Mercantile Co. v. Ainsworth (Tex. Civ. App.) 258 S. W. 205. No attention seemed to have been paid to the financial ability of customers to pay for cotton whose values ran into thousands of dollars, but any one was accepted as a customer who could deposit a margin.

■ As said by this court in Kenedy Mercantile Co. v. Ainsworth, herein cited:

"The form of the contract cannot be conclusive as to the true character of the transaction, and need not be given great importance. If it can be deduced from the affair, no matter how ingeniously * * * concealed under the guise and mask of an innocent contract, that an illegal agreement was being covered up, the contract should be declared illegal and void."

The facts clearly show that the business conducted by the parties in San Antonio and New Orleans was contrary to public policy and in violation of the criminal statutes of Texas.

■ It would follow that every contract arising out of the transactions pertaining to such illegal business would be incapable of

enforcement in the courts of the state. The business being unlawful, every contract made to directly encourage and advance the business would be illegal. Money designed and intended to pay the expenses of the business, to buy office furniture and equipment, would be tainted with the illegality of the business and could not be collected at law. Hibbler v. Howe (Tex. Civ. App.) 295 S. W. 299.

■ The note for $3,500, given by appellant to appellees, had as its consideration cash, and personal property advanced by appellees to aid appellant in the business in which he was engaged as an ally and assistant to appellees in their legal business. They furnished the money to assist appellant in conducting his business with which they were fully acquainted and from which they were reaping one-half of the fees received by appellant. Reed v. Brewer (Tex. Civ. App.) 36 S. W. 99, affirmed by Supreme Court in 90 Tex. 144, 37 S. W. 418.

■ The note for $7,250 was for cash advanced by appellees to appellant and his partner to enable them to pay a debt for which they were liable to Norman & Co. of New Orleans, and who were engaged in the same kind of business in which appellees were engaged. Appellees desired the co-operation and aid of appellant in San Antonio to gain business, and, in order to release appellant from his engagement with Norman & Co., appellees advanced the money to enable appellant to pay the debt to Norman & Co., and he and his partner executed the note for $7,250 to appellees. The note evidenced a just and valid debt to appellees. It would not matter that the money was due by appellant in a gambling transaction and that the collection of the money could not have been enforced in the courts, still appellees had no connection with the illegality of the transaction and even with their knowledge of the use to which the money was intended to be applied, they can collect the money lent by them to appellant. It does not matter what the object and intent of appellees were in lending the money; the loan was legal and for a valuable consideration. The money was due Norman & Co. by appellant, it was an accomplished transaction before appellees had any connection with it, and they had nothing to do with the debt in any way. They merely let appellant have the money to pay a debt due by him to Norman & Co., however that debt may have been contracted. The transaction as to the loan of the money was not germane to nor grew out of the business relations afterwards created between the parties. The money was appropriated by Norman & Co. and had no direct connection with the San Antonio business. Boggess v. Lilly, 18 Tex. 200; Floyd v. Patterson, 72 Tex. 202, 10 S. W. 526, 13 Am. St. Rep. 787; Oliphant v. Markham, 79 Tex. 543, 15 S. W. 569, 23 Am. St. Rep. 363.

■ The test, as stated in Floyd v. Patterson, cited case, "is whether the plaintiff requires any aid from the illegal transaction to establish his case." See, also, Simon v Garlitz, 63 Tex. Civ. App. 172, 133 S. W. 461.

The judgment is affirmed as to the $7,250, but reversed as to the $3,500, for which it is ordered that appellees take nothing, and appellees will pay all costs of this appeal.